# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| SONYA SUE WOOD, | ) | CASE NO. 3:17CV2620 |
| | ) | |
| Plaintiff, | ) | JUDGE JEFFREY HELMICK |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION** |

Plaintiff, Sonya Sue Wood, ("Plaintiff' or "Wood"), challenges the final decision of

Defendant, Nancy A. Berryhill,[1] Acting Commissioner of Social Security ("Commissioner"),

denying her applications for Period of Disability ("POD"), Disability Insurance Benefits

("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI of the Social

Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").  This Court has jurisdiction

pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate

Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and

Recommendation.  For the reasons set forth below, the Magistrate Judge recommends that the

Commissioner's final decision be VACATED and the case REMANDED for further proceedings

---

[1] On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of Social Security.

1

consistent with this decision.

## I.    PROCEDURAL HISTORY

In August 2014, Wood filed applications for POD, DIB, and SSI, alleging a disability onset date of February 1, 2007 and claiming she was disabled due to diabetes, depression, fibromyalgia, heart problems, PTSD, anxiety, and neuropathy.  (Transcript ("Tr.") 10, 227-240, 274.)  The applications were denied initially and upon reconsideration, and Wood requested a hearing before an administrative law judge ("ALJ").  (Tr. 10, 140-145, 149-153, 158.)

On March 24, 2016, an ALJ held a hearing, during which Wood, represented by counsel, and an impartial vocational expert ("VE") testified.  (Tr. 46-80.)  On August 24, 2016, the ALJ issued a written decision finding Wood was not disabled.  (Tr. 10-34.)  The ALJ's decision became final on October 25, 2017, when the Appeals Council declined further review.  (Tr. 1-6.)

On December 18, 2017, Wood filed her Complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 11, 12, 14.)  Wood asserts the following assignments of error:

(1)    The ALJ's finding that Ms. Wood's complaints were not supported by the evidence lacked the support of substantial evidence because the ALJ failed to consider all evidence in the record, and the ALJ applied the wrong legal standard in evaluating fibromyalgia.

(2)    The ALJ failed to properly evaluate the opinion of Dr. Goldsmith, the treating physician, according to the requirements of SSR 96-2p and failed to provide good reasons for rejecting the doctor's opinion that Ms. Wood would not be able to work 8 hours per day as required by SSR 96-8p and would be absent approximately 5 days per month.

(Doc. No. 11.)

## II.    EVIDENCE

**A.    Personal and Vocational Evidence**

2

Wood was born in August 1981 and was thirty-four (34) years-old at the time of her administrative hearing, making her a "younger" person under social security regulations.  (Tr. 27.)  *See* 20 C.F.R. §§ 404.1563(c) & 416.963(c).  She has a high school education and is able to communicate in English.  (*Id.*)  She has past relevant work as a bus aide, layaway cashier, cook, customer service supervisor, cafeteria aide, and playground monitor.  (*Id.*)

**B.      Relevant Medical Evidence[2]**

**1.         Physical Impairments**

On January 27, 2011, Wood presented to the emergency room ("ER") with complaints of left arm numbness, dizziness, and nausea.  (Tr. 1017-1018.)  A CT scan of her brain taken two days later showed "CSF densities" in the right parietal lobe white matter that "could reflect small cysts."  (Tr. 1072.)

Shortly thereafter, on February 1, 2011, Wood presented to primary care physician Saima Iqbal, M.D., with complaints of continued left upper extremity weakness and numbness, slight numbness of the left lower extremity, and fatigue.  (Tr. 1009-1010.)  Wood also sought treatment for her diabetes mellitus type 2, acknowledging "she is not taking her [diabetes] medication as she was supposed to be."  (*Id.*)  On examination, Dr. Iqbal noted slight (i.e., 4/5) weakness and decreased sensation in Wood's left facial area and left upper arm; normal strength in her lower extremities; and normal reflexes, gait, and cerebellar testing.  (*Id.*)  Dr. Iqbal ordered a 2D echocardiogram of Wood's heart, a carotid duplex ultrasound, and blood work.  (*Id.*)  She also

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.  In addition, although Wood alleged an onset date of February 1, 2007, she states in her Brief that "she will focus mainly on her disability from January 27, 2011 through the date of the hearing."  (Doc. No. 11 at 2.)  In discussing the medical evidence, this Court will do the same.

referred Wood to a neurologist.  (*Id.*)

On February 3, 2011, Wood underwent an MRI of her brain which showed the following: "Right parietal CSF collection most likely reflecting old infarct or prominent perivascular space and this is felt to be a remote lesion.  Some nonspecific white matter signal in the left frontal lobe is described as well."  (Tr. 1144-1145.)  On that same date, Wood also underwent an echocardiogram which showed moderate concentric left ventricular hypertrophy with evidence of diastolic dysfunction and a left ventricular ejection fraction of 50%.  (Tr. 1074.)  Finally, Wood underwent a carotid ultrasound which showed 1-15% stenosis of the right and left internal carotid arteries.  (Tr. 1076.)

On February 8, 2011, Wood presented to neurologist Mark Bej, M.D., for evaluation of her continued numbness, paresthesias, dizziness, and headaches.  (Tr. 1087-1088.)  On examination, Dr. Bej noted normal muscle tone and bulk, 4/5 muscle weakness in the left upper extremity, normal sensation in the right extremities but "loss to all modalities on the left;" mildly positive Romberg's; normal reflexes; and normal gait and station.  (*Id.*)  Dr. Bej diagnosed migraine with aura, with complicated features, currently in status; porencephaly right parietal; and white matter lesions left temporal, right deep central.  (*Id.*)  He prescribed Topiramate, and advised Wood to maintain a diary of her headaches.  (*Id.*)

Wood returned to Dr. Iqbal on February 15, 2011.  (Tr. 1007-1008.)  She reported continued numbness in her upper extremities, "which is to a point that she is unable to pick up her son, who is 30-35 pounds."  (*Id.*)  Dr. Iqbal noted Wood's echocardiogram, carotid ultrasound, and MRI were all normal.  (*Id.*)  She did, however, express concern about Wood's blood sugar levels, which were "constantly running in the range of 300s, 400s, and 500s."  (*Id.*)

4

Dr. Iqbal prescribed Lantus and Metformin for Wood's diabetes, and referred her to occupational therapy "so we can evaluate her and see how much weight she can pick up." (*Id*.)

On February 16, 2011, Wood presented for an initial evaluation with physical therapist Bill McCreedy, P.T.  (Tr. 1091.)  Examination revealed reduced muscle strength and range of motion in Wood's left upper extremity.  (*Id*.)  Mr. McCreedy recommended Wood be limited to lifting between 5 and 10 pounds at work.  (*Id*.)

Unhappy with Dr. Bej, Wood established care with neurologist Dhruv Patel, M.D., on April 11, 2011.  (Tr. 1082-1086.)  She reported bilateral upper extremity numbness, left worse than right; bilateral leg and foot pain and numbness; fatigue; "multiple pain areas in her body;" dizziness; headaches; "pins and needles tingling all over her body;" and lack of energy.  (Tr. 1082.)  On examination, Dr. Patel noted normal muscle strength, normal reflexes, normal gait, normal sensation, negative Babinski's, and no suggestion of cognitive or memory disturbance. (Tr. 1084-1085.)  He did note, however, that Wood's "multiple tender points are notable all over her body," and stated "she has an absent ankle reflex on the left."  (Tr. 1084.)  Dr. Patel assessed as follows:

> Numbness and tingling with multiple tender points.  The diagnosis would be consistent with a fibromyalgia.  The patient does have underlying diabetes and underlying neuropathic process must be ruled out.  I recommend a complete EMG nerve conduction study for the same.  If this is normal, and all her laboratory tests are normal, one would continue to consider that this is a fibromyalgic syndrome.

(Tr. 1085.)  He ordered an EMG of Wood's upper and lower bilateral extremities, which Wood underwent on June 8, 2011.  (Tr. 1140, 1142.)  With regard to Wood's lower extremities, the EMG was normal with no suggestion of a large fiber or polyneuropathy.  (Tr. 1142.)  With regard to her upper extremities, the EMG showed mild right median nerve neuropathy at the wrist as

5

seen in carpal tunnel syndrome.  (Tr. 1140.)

Wood returned to Dr. Patel on October 21, 2011.  (Tr. 991-994.)  She stated "she does not have any energy and her legs and feet hurt," and indicated "some days she can not even get out of bed."  (Tr. 991.)  Upon "close questioning," Wood indicated she has pain "all over."  (*Id*.)  On examination, Dr. Patel noted "multiple tender points," normal gait, normal sensation, and normal muscle strength.  (Tr. 991, 993.)  He assessed as follows:

> Small fiber neuropathy likely related to diabetes.  The patient has multiple other symptoms which quite do not fit into one category and does have multiple tender points amounting to more than 18.  Her diagnosis is that of fibromyalgia in association with small fiber neuropathy.

(Tr. 994.)  Dr. Patel increased her Neurontin and Savella.  (*Id*.)  He also noted Wood was depressed, and prescribed an anti-depressant.  (*Id*.)

On November 8, 2011, Wood presented to Dr. Iqbal for a diabetes follow-up visit.  (Tr. 757-759.)  She reported her symptoms were improving, but still complained of fatigue and foot paresesthesias.  (Tr. 757.)  Physical examination findings were normal, including no edema or tenderness on musculoskeletal examination.  (Tr. 758.)  Dr. Iqbal advised her regarding diet and exercise.  (Tr. 758-759.)

On March 7, 2012, Wood complained of foot paresthesias, fatigue, and insomnia.  (Tr. 895.)  She reported monitoring her blood glucose levels at home, and exercising frequently.  (*Id*.)  Wood also reported depression, generalized anxiety, and panic attacks.  (Tr. 896.)  Physical examination findings were again normal, including no edema or tenderness on musculoskeletal examination.  (Tr. 898.)  Dr. Iqbal diagnosed diabetes mellitus type 2, insulin dependent; depression; migraine headache without aura; and fibromyalgia.  (*Id*.)  She counseled Wood regarding weight reduction, general fitness, and dietary changes, and referred her to physical

6

therapy to "regain or maintain joint motion and strength." (*Id.*)

On April 23, 2012, Wood presented to the ER with complaints of lower back pain after bending over to lift a box. (Tr. 650-654.) Examination revealed diffuse tenderness in the thoracic and lumbar regions, pain with range of motion, and "mild tender points to the paraspinous soft tissue in the lumbar spine." (Tr. 652.) Wood was prescribed Flexeril, Naprosyn, and Ultram; and discharged home in improved condition. (Tr. 652-653.)

Wood returned to Dr. Iqbal on June 20, 2012 with complaints of chest pain, palpitations, and shortness of breath. (Tr. 546-552.) She rated her chest pain a 5 on a scale of 10, described it as moderate, and indicated it radiated to her left arm. (Tr. 546.) Wood also continued to complain of fatigue, depression, generalized anxiety, panic attacks, and attention impairment. (Tr. 548.) Physical examination findings were normal. (Tr. 550.) Dr. Iqbal ordered blood work, and referred Wood to cardiology for an EKG and echocardiogram. (Tr. 551.) Wood underwent a echocardiogram the next day. (Tr. 620-621.) It revealed a left ventricular ejection fraction of 45-50% with global hypokinesis and "mildly depressed" overall left ventricle function. (*Id.*)

On June 29, 2012, Wood began treatment with cardiologist Osama Ibrahim, M.D. (Tr. 544-545.) She reported fatigue, chest tightness, shortness of breath, chest pain, and palpitations. (*Id.*) Examination findings were normal. (*Id.*) Dr. Ibrahim assessed cardiomyopathy and ordered a cardiac catheterization. (*Id.*)

On June 30, 2012, Wood presented to the ER with complaints of chest pain. (Tr. 649.) She underwent a cardiac catheterization on July 2, 2012, which revealed single vessel non-obstructive coronary artery disease. (Tr. 649, 962.) Based on this test result, it was recommended that "medical management is the best therapeutic option at this time." (Tr. 963.)

7

Wood returned to Dr. Ibrahim on September 18, 2012 with complaints of continued chest pressure and shortness of breath.  (Tr. 542-543.)  Physical examination findings were normal.  (*Id*.)  Dr. Ibrahim recommended Wood continue her current medications, exercise regularly, and stop smoking.  (*Id*.)

On September 26, 2012, Wood presented to Dr. Iqbal with complaints of constant, aching back pain, which she rated a 4 on a scale of 10.  (Tr. 533-541.)  She also reported numbness and tingling.  (*Id*.)  Physical examination findings were normal, including no edema or tenderness on musculoskeletal examination.  (Tr. 537.)  Dr. Iqbal assessed diabetes, acute back pain, depression, fibromyalgia, and migraine headache without aura; and increased the dosage of Wood's diabetes medication.  (*Id*.)

Wood thereafter changed primary care physicians, establishing care with Shannon Goldsmith, D.O., on January 4, 2013.  (Tr. 529-532.)  She complained of dizziness, "seeing stars," and left-sided numbness and weakness.  (Tr. 529.)  On examination, Dr. Goldsmith noted a cranial nerve deficit and sensory deficit in Wood's face and upper arm, as well as abnormal muscle tone in her left arm.  (Tr. 530.)  Dr. Goldsmith assessed facial numbness, left-sided weakness, and near syncope.  (Tr. 531.)  She referred Wood for a CT scan, which was unchanged since her previous scan in 2011.  (*Id.*)

On January 15, 2013, Wood returned to Dr. Ibrahim, with complaints of continued chest pain, shortness of breath, dizziness, and left arm numbness.  (Tr. 526-528.)  Examination findings were normal.  (Tr. 527.)  Dr. Ibrahim advised Wood to continue her current therapy and exercise regularly.  (Tr. 528.)  He also noted that Wood had "atypical features for chest pain" and stated he would closely observe her.  (*Id*.)

8

Wood returned to Dr. Goldsmith on January 28, 2013.  (Tr. 521-525.)  She complained of fatigue, headaches, myalgias, dizziness, weakness, and mood changes.  (Tr. 522.)  With regard to her diabetes, Wood reported she was "compliant with treatment most of the time," following a "generally healthy diet," and participating in exercise intermittently.  (Tr. 522-523.)  Physical examination findings were normal.  (Tr. 523-524.)  Dr. Goldsmith prescribed Wellbutrin and discussed with Wood the dangers of uncontrolled diabetes.  (Tr. 524.)

On April 16, 2013, Wood returned to Dr. Ibrahim for a preoperative cardiac risk assessment prior to hysterectomy.  (Tr. 514-515.)  She reported accelerating chest heaviness and shortness of breath.  (*Id*.)  An ECG performed that date demonstrated changes "concerning for underlying ischemia."  (*Id*.)  Dr. Ibrahim heard a heart murmur on examination.  (*Id*.)  He prescribed Ranexa and ordered another cardiac catheterization.  (Tr. 515.)  Wood underwent the cardiac catheterization the following day, which revealed single vessel non-obstructive coronary artery disease.  (Tr. 971-972.)

On June 20, 2013, Wood returned to Dr. Goldsmith for follow up regarding her diabetes. (Tr. 502-505.)  She reported she was compliant with her medication "some of the time," but ate "whatever" and did not participate in regular exercise due to "lack of motivation and stress."  (Tr. 502.)  Examination findings were normal.  (Tr. 503.)  Dr. Goldsmith had a "long discussion" with Wood about the "need to get serious" regarding her diabetes.  (*Id*.)  Wood indicated she wanted to go back on an insulin pump.  (*Id*.)

Wood returned to Dr. Goldsmith on November 6, 2013.  (Tr. 486-489.)  At this visit, Wood reported she was compliant with some of her medications; compliant with her diet "most of the time," and engaged in no regular exercise.  (Tr. 487.)  She complained of worsening

9

depression and lack of motivation.  (Tr. 488.)  Physical examination findings were normal, but Dr. Goldsmith did note a depressed mood on psychiatric examination.  (Tr. 489.)  She diagnosed diabetes mellitus type 2, obesity, depression, and fibromyalgia; and doubled Wood's Wellbutrin dosage.  (*Id*.)

On March 31, 2014, Wood presented to Dina Serhal, M.D., for evaluation of her diabetes. (Tr. 409-412.)  Wood complained of ankle pain, numbness and tingling in her feet, and depression.  (Tr. 411.)  Examination findings were normal.  (*Id*.)  Dr. Serhal counseled Wood regarding her diet and medications, referred to her a dietician, and adjusted her diabetes medications.  (Tr. 412.)

Wood returned to Dr. Goldsmith on April 3, 2014.  (Tr. 478-485.)  She reported she was compliant "all of the time" with her diabetes medication, but non-compliant with diet or exercise recommendations.  (Tr. 479.)  Examination findings were normal, with the exception of bilateral nonpitting edema and a rash on Wood's chest.  (Tr. 481.)  Dr. Goldsmith again counseled Wood regarding her diabetes.  (*Id*.)

On September 3, 2014, Wood reported to Dr. Goldsmith that she was complaint with her diabetes medication and diet "most of the time," but did not participate in regular exercise.  (Tr. 467.)  She also reported several hypoglycemic episodes, during which she felt "shaky."  (*Id*.) Wood indicated she continued to struggle with depression but denied suicidal thoughts.  (Tr. 468.)  Physical examination findings were normal, but Dr. Goldsmith noted depressed mood on psychiatric examination.  (Tr. 469.)  She stressed the need for Wood to significantly improve her diet compliance, and advised her again to quit smoking.  (*Id*.)

On October 30, 2014, Wood presented to the ER with complaints of back pain.  (Tr. 684-

685, 690.)  She presented to Saadia Hussain, M.D., several days later for evaluation.  (Tr. 770-772.)  Wood described her lower back pain as sharp and shooting, and rated it a 10 on a scale of 10.  (Tr. 771.)  She stated it was constant with spasms, radiated down her left leg, and was aggravated by sitting, walking and bending.  (*Id*.)  On examination, Dr. Hussain noted tenderness to palpation from L3 all the way down to S1, paraspinal muscle spasms, decreased sensation in the right lower extremity, and reduced muscle strength in Wood's bilateral lower extremities.  (Tr. 772.)  She prescribed Flexeril and a Medrol Pak; referred Wood to physical therapy; and ordered a lumbar x-ray.  (*Id*.)  Wood underwent the lumbar x-ray on November 4, 2014, which was negative.  (Tr. 944.)

Wood returned to Dr. Goldsmith on December 16, 2014.  (Tr. 773-776.)  She complained of intermittent chest pain, which she described as "squeezing," "heavy," and radiating to her left arm.  (Tr. 774.)  Associated symptoms included cough, headache, palpitations, and shortness of breath.  (*Id*.)  Wood also reported short term memory problems.  (Tr. 775.)  On examination, Dr. Goldsmith noted "significantly absent sensation on both feet on dorsal and plantar aspect."  (Tr. 776.)  She also remarked that Wood was unable to recall certain names and events.  (*Id*.)  Dr. Goldsmith assessed intermittent chest pain, coronary artery disease, memory loss, and diabetes. (*Id*.)  She referred Wood to neurology.  (*Id*.)

On January 27, 2015, after an over three year absence, Wood returned to neurologist Dr. Patel for evaluation of her memory loss and numbness.  (Tr. 712-717.)  Wood reported the following symptoms:

> [Wood] is a 33-year-old right-handed female who is here for memory loss and a history of stroke.  She was last seen in August, 2011 for numbness. The patient reports she is having short term memory issues and if her appointments  are not written down, she forgets them.  She is having numbness and tingling in her hands.

11

> She gets eyes crossed at times.  She has dizziness and nausea.  She has pain in her
> back and neck.  The patient has a 12 x 7 mm focus in the right parietal lobe and also
> the left parietal lobe in the past.  MRI of the brain with gadolinium was obtained.
> There is a suggestion of an old infarction.  She had an upper and lower extremity
> EMG nerve conduction study which are normal.  She has had an echo in the past
> which did not show anything significant. The patient has diabetes and a small fiber
> neuropathy.  The patient has multiple risk factors for cerebrovascular disease
> including diabetes and a previous history of stroke. The patient is on Topiramate as
> well and it may be causing some numbness.  The patient has multiple symptoms of
> post-traumatic stress disorder.  The last hemoglobin A1C was 8.8.  She has
> numbness and she does not feel her feet. She is not sleeping well.  Her headaches
> have continued to worsen. She has significant anxiety and depression. She is on
> Brintellix 10 mg. The patient is seeing a psychiatrist.

(Tr. 712.)  Physical examination findings were normal, including normal heart rate and rhythm, normal lungs, full muscle strength, normal reflexes, negative Babinski's, negative Romberg's, normal gait, and normal sensory exam.  (Tr. 715-716.)  Dr. Patel assessed memory loss, hereditary peripheral neuropathy, and disturbance of skin sensation.  (Tr. 716.)  He found Wood's "memory issues appear to be a combination of underlying depression, anxiety, stroke and post-traumatic stress disorder."  (Tr. 716.)  Dr. Patel noted Wood's Hemoglobin A1c was "still uncontrolled," and recommended Wood "pay attention to this."  (Tr. 717.)  He further stated she has coronary artery disease "with a suggestion of 70% blocking one of the arteries." (*Id*.)  Dr. Patel recommended increasing Wood's Brintellix dosage, and ordered another MRI of her brain.  (Tr. 716-717.)

On January 28, 2015, Wood began treatment with cardiologist Ismail S. Ahmed, M.D. (Tr. 777-781.)  Physical examination findings were normal, including normal heart rate and rhythm, normal range of motion, no joint swelling or tenderness, normal gait, and normal coordination.  (Tr. 779.)  Dr. Ahmed diagnosed chest pain and coronary artery disease.  (Tr. 780.) He recommended Wood follow a "cardiac diet" and exercise regularly; and ordered a Stress Test

12

and Echocardiogram.  (*Id*.)

On February 6, 2015, Wood underwent an electroencephalogram ("EEG"), which was normal.  (Tr. 1100.)  Several weeks later, on February 18, 2015, she underwent an ultrasound of her carotid arteries, which revealed 1-15% stenosis of her right and left internal carotid arteries.  (Tr. 756.)  On that same date, Wood underwent an MRI of her brain, which showed a "round, small prominent CSF collection in the right parietal lobe" most likely reflecting a prominent perivascular space, as well as "a few nonspecific areas of increased signal in the left frontal lobe."  (Tr. 942.)  Wood also underwent a stress test, which was apparently negative.  (Tr. 1170.)

On June 29, 2015, Wood presented to the ER with complaints of chest pain.  (Tr. 1170.)  She was admitted overnight for observation and treated with nitroglycerin.  (*Id*.)  Examination findings on June 30, 2015 were normal, and Wood was discharged home with instructions to follow up with her cardiologist.  (*Id*.)

On August 11, 2015, Wood presented to cardiologist Ryan Christofferson, M.D.  (Tr. 1154-1158.)  She complained of continued chest pain, tightness, and pressure.  (Tr. 1154.)  Examination findings were normal.  (Tr. 1156.)  Dr. Christofferson assessed coronary artery disease, moderate left anterior descending artery lesion, hypertension, hyperlipidemia, and diabetes, as well as a history of supraventicular tachycardia.  (Tr. 1154.)  He also determined Wood suffered from Class III Stable Angina.  (Tr. 1159.)  After a long discussion with Wood, Dr. Christofferson agreed to perform another cardiac catheterization in light of her "ongoing and relentless chest pain symptoms."  (Tr. 1154.)

Wood underwent the cardiac catheterization on August 13, 2015.  (Tr. 1151-1153, 1160-1161.)  This study revealed that Wood's proximal left anterior descending artery had 65%

13

stenosis, and her mid left anterior descending artery had 40% stenosis.  (Tr. 1161.)  It also showed that a small posterolateral ventricular branch of Wood's right coronary artery was 80% stenotic.  (*Id.*)  Dr. Christofferson later prescribed Wood a handicap placard.  (Tr. 1209.)

On February 1, 2016, Dr. Goldsmith completed a Medical Statement regarding Wood's Physical Abilities and Limitations.  (Tr. 1205-1206.)  She identified diagnoses of type 2 diabetes mellitus, diabetic neuropathy, SVT, history of stroke, fibromyalgia, migraine headaches, and bipolar depression.  (*Id.*)  Dr. Goldsmith concluded Wood could lift 10 to 20 pounds occasionally and 5 pounds frequently; stand for 30 minutes at one time and for a total of 2 hours in a workday; and sit for 60 minutes at one time and for a total of 4 hours in a workday.  (*Id.*)  She further found Wood could constantly balance; frequently engage in fine manipulation bilaterally; occasionally bend, stoop, and work around dangerous machinery; and never engage in gross manipulation bilaterally or raise her left or right arm over her shoulders.  (*Id.*)  Dr. Goldsmith characterized Wood's pain as "moderate."  (*Id.*)  Lastly, Dr. Goldsmith noted as follows: "[Patient] needs to change positions frequently.  Has 'good and bad days.'  She would likely miss > 5 days per month due to her medical issues."  (*Id.*)

### 2.        Mental Impairments

The first mention of Wood's depression and anxiety is in a treatment note dated October 21, 2011.  (Tr. 991-994.)  On that date, Wood presented to neurologist Dr. Patel and reported feeling depressed.  (Tr. 994.)  Dr. Patel prescribed an antidepressant.  (*Id.*)

In March 2012, Wood presented to Dr. Iqbal with complaints of worsening depression, generalized anxiety, and panic attacks.  (Tr. 896.)  She indicated this was a "chronic problem" for her that was precipitated by emotional stress relating to her divorce.  (*Id.*)  Wood reported

14

numerous associated symptoms, including fatigue, agitation, and attention impairment.  (*Id*.)  Dr. Iqbal found "the degree of incapacity that she is experiencing as a consequence of her [mental] illness is mild."  (*Id*.)

Wood reported similar symptoms in June 2012, September 2012, and January 2013.  (Tr. 534, 548, 522.)  In January 2013, Dr. Goldsmith noted additional symptoms including anhedonia, hypersomnia, poor judgment, headaches, and myalgia.  (Tr. 522.)  At that time, Dr. Goldsmith indicated the "degree of incapacity that [Wood] is experiencing as a consequence of her illness is moderate."  (*Id*.)  She prescribed Wellbutrin.  (Tr. 524.)

On November 6, 2013, Wood reported "worsening depression."  (Tr. 488.)  She felt sad and unmotivated, and admitted she had thought she would be "better off if not here."  (*Id*.)  Wood denied suicidal ideation.  (*Id*.)  Dr. Goldsmith doubled Wood's Wellbutrin dosage and recommended she consult a therapist.  (Tr. 489.)

On July 21, 2014, Wood presented to Dr. Hussain.  (Tr. 763-764.)  She was accompanied by her husband, who stated he "came home to her today crying and threatening to take an overdose of Vicodin pills."  (*Id*.)  Wood was "non-verbal" and crying at the appointment.  (*Id*.)  Dr. Hussain noted Wood admitted she wanted to end her life.  (*Id*.)  She advised Wood and her husband to proceed directly to the hospital.  (*Id*.)

Wood was admitted to the hospital on that date for depression and suicidal thoughts.  (Tr. 388-389.)  She reported her depression had worsened over the past several weeks, and indicated she was feeling hopeless and worthless.  (*Id*.)  Wood also complained of decreased concentration, generalized anxiety, poor sleep, poor appetite, and suicidal thoughts.  (*Id*.)  On mental status examination, Balaji Saravanan, M.D., found Wood was alert, oriented, and cooperative with

15

good eye contact.  (Tr. 389.)  He noted decreased psychomotor activity, decreased speech rate and rhythm, depressed mood, and restricted affect.  (*Id*.)  Dr. Saravanan diagnosed recurrent major depressive disorder, currently moderate to severe.  (*Id*.)  He admitted Wood for observation and prescribed Zoloft, Trazodone, and Ativan.  (*Id*.)  Wood was discharged on July 23, 2014, after a two day hospital stay.  (Tr. 434.)

On July 31, 2014, Wood presented to Dr. Goldsmith for follow-up.  (Tr. 473-477.)  She reported that, since her discharge, she no longer had suicidal thoughts but still felt "very depressed and moody."  (Tr. 473.)  Wood indicated she could not go out in public because "she has an anxiety attack."  (Tr. 473-474.)  On examination, Dr. Goldsmith noted Wood was nervous/anxious with delayed and slowed speech and a depressed mood.  (Tr. 474.)  Dr. Goldsmith "stressed the need" for follow up with a psychologist and counselor.  (*Id*.)

On August 4, 2014, Wood was seen at Firelands Counseling for an intake session.  (Tr. 398-402.)  She denied suicidal thoughts but indicated she had been depressed "for a long time."  (Tr. 398.)  Wood reported feelings of hopelessness, helplessness, worthlessness, and guilt.  (*Id*.)  She indicated she had difficulty sleeping and making decisions, and stated her focus and concentration were poor.  (*Id*.)  Wood also complained that "most days she does not want to get out of bed and has no motivation to do anything."  (*Id*.)  She reported anxiety about "everything," especially leaving the house.  (*Id*.)  When she did go out in public, Wood indicated she suffered from panic attacks "where she will shake, her heart will start racing, she will feel like she cannot breathe, and her chest hurts."  (*Id*.)  She also reported nightmares and flashbacks about a previous abusive relationship.  (*Id*.)  On examination, Wood was guarded and withdrawn with a flat affect and depressed and anxious mood.  (Tr. 400.)  She was diagnosed with major depressive disorder

16

and post-traumatic stress disorder.  (*Id*.)

Wood returned to Dr. Goldsmith on September 3, 2014.  (Tr. 466-472.)  She continued to struggle with depression but did not feel "quite as angry."  (Tr. 468.)  She denied suicidal thoughts but reported she was under a lot of stress relating to the recent death of her father.  (*Id*.)

Wood presented to counselor Melissa Allton-Cameron, P.C., several times in December 2014.  (Tr. 722, 723, 726.)  She reported continuing anxiety about leaving the house alone, indicating she needed her husband to drive her to therapy sessions and "gets very anxious about him leaving the house for employment." (Tr. 723.)  At the end of December 2014, Wood reported her medications "seem to be working for her." (Tr. 726.)  At each of these sessions, Wood was alert and oriented, with appropriate behavior and either an appropriate or euthymic affect.  (Tr. 722, 723, 726.)

On December 16, 2014, Wood presented to psychiatrist Shura Hegde, M.D.  (Tr. 724-725.)  She reported "doing fair" on her medications, which included Seroquel and Brintellix. (*Id*.)  On examination, Dr. Hegde found Wood was pleasant and cooperative with good eye contact, a "somewhat sad" mood, appropriate affect, normal speech, linear thought process, intact memory, and fair judgment and insight.  (*Id*.)  Dr. Hegde diagnosed major depression, recurrent; and unspecified personality disorder.  (*Id*.)  She advised Wood to continue on her medications. (*Id.*)

Wood returned to Counselor Allton-Cameron on five occasions between January and April 2015.  (Tr. 727, 1175-1178.)  In January 2015, Wood was anxious and reported that "mentally she does not care right now about anything." (Tr. 727.)  In February and early March 2015, Wood had a normal affect with appropriate behavior and no suicidal thoughts.  (Tr. 1175,

17

1176.)  On March 25, 2015, Wood indicated she had had a "rough couple of weeks." (Tr. 1177.)
In April 2015, Wood stated "the last couple of weeks have not been good" due to stress and
frustration with her family.  (Tr. 1178.)  On examination, she was alert and oriented with a full
affect and appropriate behavior.  (*Id*.)

On April 22, 2015, Wood presented to Dr. Hegde.  (Tr. 1179-1180.)  She denied suicidal
thoughts, paranoia, mania, and racing thoughts.  (*Id*.)  Wood reported her sleep and appetite were
good.  (*Id*.)  On examination, Wood was pleasant and cooperative with good eye contact.  (*Id.*)
She had a euthymic mood, appropriate affect, normal speech, linear thought process, normal
thought content, intact memory, and fair judgment and insight.  (*Id*.)  Dr. Hegde adjusted Wood's
medications, discontinuing the Seroquel and adding both Latuda and Trazodone.  (*Id*.)

Wood continued to present regularly to Counselor Allton-Cameron.  (Tr. 1181-1185,
1188.)  On May 21, 2015, Wood reported she "never feels good and is always in pain."  (Tr.
1181.)  She stated she "cannot do anything without [her husband] by her side" and "has given up
and is barely functioning."  (*Id*.)  On examination, Counselor Allton-Cameron noted Wood had a
depressed mood and had regressed.  (*Id*.)  The following week, Wood stated "things have not
gotten much better," although she was able to attend the session without her husband.  (Tr.
1182.)  Counselor Allton-Cameron again noted Wood had a depressed mood and had regressed
from her goals.  (*Id*.)  On July 2, 2015, Wood was described as anxious, depressed, and agitated.
(Tr. 1185.)

On July 22, 2015, Wood returned to Dr. Hegde for follow-up.  (Tr. 1186-1187.)  She
reported feeling "bad, sad, irritable, [and] agitated" and complained of racing thoughts.  (*Id*.)  On
examination, Dr. Hegde noted irritable mood, appropriate affect, normal speech, linear thought

18

process, normal thought content, intact memory, and fair judgment and insight. (*Id*.) Dr. Hegde again adjusted Wood's medications, increasing the Latuda dosage, discontinuing Trazodone, and re-initiating Seroquel. (*Id*.)

On August 12, 2015, Wood indicated Seroquel was helping but reporting she was still "struggling." (Tr. 1189.) Dr. Hegde diagnosed major depression, recurrent; rule out bipolar disorder; unspecified personality disorder, and history of PTSD. (*Id*.) He again adjusted Wood's medications. (*Id*.)

In September 2015, Wood stated "she is doing okay mentally but has times when she feels like she can't take the stress of her life." (Tr. 1193.) Wood reported "chaos within the home," and feeling overwhelmed by family and financial issues. (Tr. 1193, 1195.) On examination, her affect and behavior were appropriate. (Tr. 1195.)

On October 6, 2015, Wood returned to Dr. Hegde. (Tr. 1196.) She indicated she was "doing better than before" and was "able to manage herself." (*Id*.) On examination, Dr. Hegde noted better mood, bright affect, normal speech, linear thought process, normal thought content, intact memory, and fair judgment/insight. (*Id.*) Dr. Hegde continued Wood on her medications. (*Id*.)

In November 2015, Wood met with Counselor Allton-Cameron and reported feeling "worried about what could happen at the house when [she] is home alone because her husband has been forced to go back to work part-time." (Tr. 1198.) Wood repeated these concerns the following month. (Tr. 1199.) She indicated "she has given up and would rather just stay in bed." (*Id*.) Wood returned to Dr. Hegde on November 25, 2015. (Tr. 1200.) She reported experiencing less mood swings. (*Id*.) Mental status examination findings were largely normal,

19

and Wood was continued on her medications.  (*Id*.)

In January 2016, Wood reported the holidays were "tough" and indicated she "doesn't really have any desire to do anything, let alone get out of bed." (Tr. 1202.)  Counselor Allton-Cameron noted Wood "is still suffering from anxiety and will often leave a public place if the anxiety becomes too much to handle."  (*Id*.)  Later that month, however, Wood reported she was able to go to her son's basketball game and out to dinner with her mother.  (Tr. 1203.)  On January 25, 2016, Wood admitted "there are still times when she does not care what happens because she has so many health issues."  (Tr. 1204.)

On February 10, 2016, Dr. Hegde submitted a letter to the Huron County Department of Job/Family Services.  (Tr. 1212.)  Therein, Dr. Hegde stated as follows: "It is my professional opinion, that due to Ms. Wood's mental health symptoms, she is not capable of working the employment portion that is part of the JOBS Program."  (*Id.*)

## C.    State Agency Reports

### 1.    Physical Impairments

On December 3, 2014, state agency physician Edmond Gardner, M.D., reviewed Wood's medical records and completed a Physical Residual Functional Capacity ("RFC") Assessment. (Tr. 87-88.)  Dr. Gardner concluded Wood could lift and carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk for about 6 hours in an 8 hour workday; and sit for about 6 hours in an 8 hour workday.  (*Id*.)  He further found Wood had an unlimited capacity to push/pull and no postural, manipulative, or environmental limitations.  (*Id.*)

On March 23, 2015, state agency physician Bradley Lewis, M.D., reviewed Wood's medical records and completed a Physical RFC Assessment.  (Tr. 115-118.)  Like Dr. Gardner,

Dr. Lewis found Wood could lift and carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk for about 6 hours in an 8 hour workday; and sit for about 6 hours in an 8 hour workday.  (*Id*.)  In addition, he concluded Wood had an unlimited capacity to kneel, crawl, and climb ramps and stairs; and could frequently stoop, crouch, and engage in bilateral foot controls; occasionally balance; and never climb ladders, ropes, or scaffolds.  (*Id*.)  Dr. Lewis found no manipulative limitations but opined Wood should avoid all exposure to unprotected heights and dangerous machinery due to her neuropathy.  (*Id*.)

### 2.    Mental Impairments

On December 9, 2014, state agency psychologist Larry Kravitz, Psy.D., reviewed Wood's medical records and completed a Psychiatric Review Technique ("PRT") and Mental RFC Assessment.  (Tr. 86, 88-91.)  In the PRT, Dr. Kravitz found Wood was moderately restricted in her activities of daily living, social functioning, and ability to maintain concentration, persistence, or pace.  (Tr. 86.)  He also concluded she had "one or two" episodes of decompensation each of extended duration.  (*Id*.)

In the Mental RFC, Dr. Kravitz found Wood was moderately limited in her abilities to:

- Understand, remember, and carry out detailed instructions;

- Maintain attention and concentration for extended periods;

- Work in coordination with or in proximity to others without being distracted by them;

- Complete a normal workday or workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods;

- Interact appropriately with the general public;

- Accept instructions and respond appropriately to criticism from supervisors;

21

- Get along with coworkers or peers without distracting them or exhibiting behavioral extremes;

- Respond appropriately to changes in the work setting;

- Travel in unfamiliar places or use public transportation;

- Set realistic goals or make plans independently of others.

(Tr. 88-91.) In the narrative portion of the Assessment, Dr. Kravitz explained as follows:

> While limited by her depression, claimant has the ability to understand and remember instructions for simple tasks of a routine and repetitive nature. Claimant's anxiety and avoidance of social contacts would make involved interpersonal exchanges difficult and limit her primarily to brief and superficial workplace contacts. Claimant would do best in a work environment that minimized contact with large groups of co-workers, did not require work with the public, and provided for a relatively isolated work setting. Claimant would adapt more easily to a low stress job where speed of performance was not essential for the work tasks.

(Tr. 90.)

On March 26, 2015, state agency psychologist Paul Tangeman, Ph.D., reviewed Wood's

medical records and completed a PRT and Mental RFC Assessment. (Tr. 113-114, 118-121.)

Dr. Tangeman reached the same conclusions as Dr. Kravitz. (*Id.*)

**D.    Hearing Testimony**

During the March 24, 2016 hearing, Wood testified to the following:

- She lives in a house with her husband and four children. (Tr. 50.) She has a driver's license but has not driven for two years because of her medical conditions. (Tr. 51.)

- She completed the twelfth grade. (Tr. 51.) She has prior work experience as a stocker, customer service supervisor, short order cook, cashier, bus aide, cafeteria aide, and playground monitor. (Tr. 51-53.) In several of these jobs, she was required to stand all day and lift up to 50 pounds. (*Id.*)

- She can no longer work because she suffers from migraines, heart disease,

diabetes, coronary artery disease, angina attacks, depression, anxiety attacks,
fibromyalgia, and neuropathy.  (Tr. 55.)  She takes numerous medications for
these conditions, including Trazodone, Topamax, NovoLog, Lantus, Ranexa,
Brintellix, and Claritin.  (Tr. 59-60.)

- She has suffered from migraines for several years.  (Tr. 56.)  She generally
  experiences migraines two to three times per week.  (Tr. 55.)  They last from two
  to three hours, up to eight to ten hours.  (Tr. 55-56.)  She becomes nauseous, and
  is sensitive to light and noise during her migraines.  (*Id.*)  She takes preventative
  medication for her migraines but still gets them.  (*Id.*)

- She had a stroke in 2011, and was diagnosed with heart disease in 2013.  (Tr.
  56.)  She experiences shortness of breath with "any form of long walking up and
  down the stairs."  (Tr. 57.)  She also has chest pains once per week, during
  which she feels tightness and pressure.  (*Id.*)

- Her diabetes is not under good control, despite the fact that she uses an insulin
  pump and takes medication.  (Tr. 57-58.)  She has had an insulin pump for the
  past seven to eight years.  (*Id.*)  She checks her blood sugar levels four to six
  times per day.  (Tr. 67.)  Her levels are out of range at least twice per day.  (*Id.*)
  If her blood sugar levels are too low, she often feels dizzy and faint.  (*Id.*)

- As a result of her fibromyalgia, she experiences pain in her arms, legs, and back.
  (Tr. 58.)  She rated her arm pain a 3 on a scale of 10, and her leg and foot pain a
  7 to 8 on a scale of 10.  (*Id.*)  She also experiences neuropathy in her arms, legs,
  hands, and feet.  (*Id.*)  She drops things "a lot" and cannot feel whether
  something is hot or cold.  (Tr. 65, 68.)

- In July 2014, she suffered a nervous breakdown.  (Tr. 52.)  Since then, she has
  suffered from memory loss and anxiety attacks.  (Tr. 52, 60-62.)  She also has a
  very difficult time concentrating, especially on everyday tasks.  (Tr. 61.)  She
  needs reminders to take her medication, and is not always able to follow
  television shows.  (Tr. 61.)  She sees a psychologist and a counselor for her
  depression and anxiety.  (Tr. 60.)

- She feels very anxious about being around people.  (Tr. 62.)  She is afraid
  something bad will happen, or people will stare at her.  (*Id.*)  "As long as [she is]
  home in [her] safe zone, [she's] usually okay."  (Tr. 64.)  She does not like to
  leave her house and "shakes the whole time" she is not at home.  (*Id.*)  She
  generally leaves the house twice per week for doctor's appointments or to go
  someplace with her husband.  (Tr. 64-66.)  She recently went to her son's
  basketball game but it was "not easy."  (Tr. 66.)  She also went to lunch with her
  mom but she "shook the entire time."  (*Id.*)

23

- She has no problems with self-care or getting dressed. (Tr. 63.) Her husband and children do 90% of the household chores. (*Id*.) She occasionally sweeps and dusts. (*Id.*)

- On a typical day, she gets three of her sons off to school, eats breakfast, and then lies down for four to five hours. (Tr. 62.) Her oldest son is homeschooled and, in the afternoons, she helps him with his homework. (*Id*.) She will cook dinner if she feels up to it. (*Id*.) She then watches television and plays with the kids. (*Id.*)

- She can only lift and carry 5 to 10 pounds. (Tr. 58-59.) She can walk 200 feet before needing to stop due to shortness of breath and leg/foot pain. (*Id*) She can stand for 10 to 15 minutes. (*Id*.) She does not have a problem sitting, until her legs start to fall asleep. (*Id*.) She lies down "quite a bit" during the day, typically taking a 3 to 4 hour nap each afternoon. (Tr. 59.) She can follow one to two step instructions. (Tr. 62.)

The VE testified Wood had past work as a (1) bus aide (light but performed medium to heavy, SVP 2); (2) cafeteria aide (light but performed as medium, SVP 3); (3) playground monitor (light, SVP 2); (4) short order cook (light but performed as medium, SVP 3); (5) customer service representative (light, SVP 3); (6) store laborer (medium, SVP 2); and (7) customer service stock person (medium, SVP 2). (Tr. 70-71.) The ALJ then posed the following hypothetical question:

> Please assume a hypothetical individual of the Claimant's age, education, and work
> experience who is able to perform medium exertional work activities, however the individual should never climb ladders, ropes, and scaffolds; and can perform simple routine and repetitive tasks. Can the hypothetical individual perform any other occupations -- well first, can the hypothetical individual perform any of the past jobs as generally or actually performed?

(Tr. 71.) The VE testified the hypothetical individual would not be able to perform Wood's past work as a cafeteria aide, playground monitor, cook, or customer service stock person; but would be able to perform Wood's past work as a bus aide. (Tr. 71.) The VE further explained the hypothetical individual would also be able to perform other representative jobs at the medium

24

exertional level in the economy, such as industrial cleaner, dining room attendant, and store's

laborer. (Tr. 71-72.)

The ALJ then asked the VE to consider the same hypothetical with the additional

limitation that the individual can frequently handle, finger, and feel on the right. (Tr. 72.) The

VE testified the hypothetical individual could perform the representative occupations of

industrial cleaner, store's laborer, and floor waxer. (*Id.*)

The ALJ then asked the VE to consider a second hypothetical, as follows:

> Please assume a hypothetical individual of the Claimant's age, education, and work
> experience who is able to perform light exertional work activities as defined in the
> regulations. The individual can occasionally push and pull in the bilateral lower
> extremities. The individual can change positions every 30 minutes for one to two
> minutes within the immediate vicinity of the workstation. The individual can
> frequently use foot controls bilaterally; occasionally balance; frequently stoop and
> crouch; never climb ladders, ropes, and scaffolds; never be exposed to unprotected
> heights, dangers moving mechanical parts or operate a motor vehicle. The
> individual can understand, remember, and carry out simple routine and repetitive
> tasks but not at a production and rate pace such as assembly line work. The
> individual can frequently interact with supervisors, occasionally interact with
> coworkers, and never interact with the public.

(Tr. 72-73.) The VE testified the hypothetical individual would not be able to perform any of

Wood's past work but would be able to perform representative jobs at the light exertional level in

the economy, including merchandise marker, photocopy machine operator, and office helper.

(Tr. 73-74.)

The ALJ then asked the VE to consider the above hypothetical with the following

additional limitations: "the individual can frequently use hand controls on the right and left;

frequently handle, finger, and feel on the right and left; the individual can understand, remember

and carry out simple work-related decisions; changes should be well explained and introduced

slowly; and the individual should not be exposed to vibration." (Tr. 74.) The VE testified the

hypothetical individual would be able to perform the previously identified light occupations of merchandise marker, photocopy machine operator, and office helper. (Tr. 75.)

The ALJ then asked the VE to consider the above hypothetical with the further limitations that the individual can superficially[3] interact with coworkers, and occasionally interact with supervisors. (Tr. 75.) The VE testified the three previously identified light jobs (i.e, merchandise marker, photocopy machine operator, and office helper) would remain. (*Id*.)

The ALJ then asked the VE to consider the second hypothetical but changed to the sedentary exertional level. (Tr. 75.) The VE testified the hypothetical individual would not be able to perform Wood's past work, but would be able to perform representative jobs at the sedentary exertional level in the economy, including address clerk, document preparer, and table worker. (Tr. 75-76.)

The ALJ then asked the VE to consider the sedentary exertional level hypothetical with the additional limitations that the individual can frequently use hand controls on the right and left; frequently handle, finger, and feel on the right and left; can understand, remember, and carry out simple work-related decisions; superficially interact with coworkers; and occasionally interact with supervisors where changes should be well explained and introduced slowly and no vibration. (Tr. 75-76.) The VE testified the hypothetical individual would be able to perform the previously identified sedentary level representative jobs of address clerk, document preparer, and table worker. (Tr. 76.)

---

[3] The ALJ explained that "by superficially I mean the ability to greet people, refer coworkers to other coworkers regarding coworkers demands or requests, answer questions about time of day and give directions to the bathroom, superficial interaction would not involve Claimant dealing directly with the demands or problems of the coworkers." (Tr. 75.)

26

Finally, the ALJ asked the VE: "And if we add at any level, medium, light, or sedentary, that the individual would miss five days a month, do any of those jobs remain?" (Tr. 76-77.) The VE testified none of the previously identified jobs (at any level) would remain with such a restriction. (Tr. 77.)

Wood's counsel then asked whether any of the previously identified sedentary jobs would remain if the hypothetical individual had less than frequent use of her bilateral hands for handling, fingering, and feeling. (Tr. 78.) The VE testified those jobs "would not be available to such an individual and there would be no other sedentary occupation that I could offer." (*Id*.) Wood's counsel then asked the VE to consider the same limitation in the context of the ALJ's light exertional level hypothetical. (*Id*.) The VE testified that "the light occupations previously identified required at least frequent bilateral handling and fingering. If there's less than that, then those occupations cannot be performed." (*Id*.)

### III.    STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).1

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and (3) she filed while she was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

A disabled claimant may also be entitled to receive SSI benefits. 20 C.F.R. § 416.905;

27

*Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010);  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d).  Fourth, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and*  416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

Here, Wood was insured on her alleged disability onset date, February 1, 2007, and

28

remains insured through June 30, 2016, her date last insured ("DLI.") (Tr. 10.) Therefore, in order to be entitled to POD and DIB, Wood must establish a continuous twelve month period of disability commencing between these dates. Any discontinuity in the twelve month period precludes an entitlement to benefits. *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV.     SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.      The claimant meets the insured status requirements of the Social Security Act through June 30, 2016.

2.      The claimant engaged in substantial gainful activity during the following period: January 2009 through December 2010 (20 CFR 404.1520(b), 404.1571 et seq., 416.920(b) and 416.971 et seq.)

3.      However, there has been a continuous 12 month period(s) during which the claimant did not engage in substantial gainful activity. The remaining findings address the period(s) the claimant did not engage in substantial gainful activity.

4.      Prior to January 27, 2011, the claimant had the following medically determinable impairments: diabetes mellitus, left foot hallux valgus deformity, and bronchitis (20 CFR 404.1521 et seq. and 416.021 et seq.)

5.       Prior to January 27, 2011, the claimant did not have an impairment or combination of impairments that significantly limited (or was expected to significantly limit) the ability to perform basic work-related activities for 12 consecutive months; therefore, the claimant did not have a severe impairment or combination of impairments (20 CFR 404.1521 et seq. and 416.021 et seq.)

6.      As of January 27, 2011, but prior to July 21, 2014, the claimant had the following severe impairments: diabetes mellitus, carpal tunnel syndrome, polyneuropathy, coronary artery disease, and cardiomyopathy, a cerebral hemisphere cyst, carotid artery stenosis, migraines, and depression (20 CFR 404.1520(c) and 416.920(c)).

7.      Since January 27, 2011, the claimant has not had an impairment or combination of impairments that met or medically equaled the severity of one

of the listed impairments in 20 CFR, Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926.)

8. After careful consideration of the entire record, the undersigned finds that, as of January 27, 2011 but prior to July 21, 2014, the claimant had the residual functional capacity to perform light work as defined in 20 CFR  404.1567(b) and  416.967(b) except she could occasionally  push and  pull with the bilateral lower extremities; could frequently operate foot controls bilaterally; could frequently use bilateral hand controls; could frequently handle, finger, and feel with the right upper extremity; could occasionally balance; could frequently crouch and crawl; could never climb ladders, ropes, or scaffolds; could never be exposed to unprotected heights, dangerous, moving mechanical parts, or operate a motor vehicle; and  could understand, remember, and carry out only simple, routine tasks.

9. In addition to those severe impairments she had prior to July 21, 2014, since July 21, 2014, the claimant has had personality disorder and a history of posttraumatic stress disorder ("PTSD") (20 CFR 404.1520(c) and 416.920(c)).

10. After careful consideration of the entire record, the undersigned finds that, since July 21, 2014, the claimant has had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she must be allowed to change position every 30 minutes for 1 to 2 minutes at a time so long as she stays within the immediate vicinity of her workstation; can occasionally  push and  pull with the  bilateral lower extremities; can frequently operate foot controls bilaterally; can frequently use bilateral hand controls; can frequently handle, finger, and feel with the right upper extremity; can occasionally  balance; can frequently crouch and crawl; can never climb ladders, ropes, or scaffolds; can never be exposed to unprotected heights, dangerous, moving mechanical parts, or operate a motor vehicle; can understand, remember, and carry out only simple, routine tasks, but not at a production rate pace (e.g. assembly line work); can make simple work-related  decisions; requires a work environment where changes are well-explained and introduced slowly; can frequently interact with supervisors; can interact superficially [footnote omitted] with coworkers; and can never interact with the general public.

11.[4] The claimant is unable to perform any past relevant work (20 CFR 404.1565

---

[4] The ALJ decision incorrectly numbers this paragraph as paragraph 10, and continues from this point on to misnumber the remaining paragraphs.  For ease of review, however, the Court will renumber these paragraphs in proper numerical order.

and 416.965).

12.    The claimant was born on August *** 1981 and was 25 years old, which is defined as a younger individual aged 18-49, on the alleged disability onset date.  She was 32 years old, again, defined as a younger individual, as of July 21, 2014 (20 CFR 404.1563 and 416.963).

13.    The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

14.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is 'not disabled,' whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

15.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

16.    The claimant has not been under a disability, as defined in the Social Security Act, from February 1, 2007, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 10-29.)

## V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)."  *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011).  Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers v.*

*Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).  In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion.  *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.")  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on

the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); accord *Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. ANALYSIS

### *RFC*

In her first assignment of error, Wood argues the ALJ failed to properly analyze the medical evidence regarding her fibromyalgia, coronary artery disease, and mental health impairments. (Doc. No. 11 at 14-20.) She first maintains the ALJ misinterpreted SSR 12-2p in determining her fibromyalgia was not a medically determinable impairment. (*Id*. at 15.) Wood then asserts the ALJ failed to fully consider and evaluate the severity of her cardiovascular impairments, noting in particular that the ALJ failed to acknowledge her diagnosis with Class III Stable Angina. (*Id*. at 18.) Finally, Wood argues the ALJ "overlooked much of [her] psychiatric treatment records and engaged in a one-sided analysis to conclude that her complaints were not supported by the record." (*Id*. at 19.)

The Commissioner argues the ALJ carefully evaluated all of Wood's impairments in

determining the RFC.  (Doc. No. 12 at 12-16.)  With regard to Wood's fibromyalgia, the

Commissioner argues the ALJ correctly evaluated this condition under SSR 12-2p, arguing "the

ALJ noted that Plaintiff's physicians did not conduct adequate testing to rule out other disorders

as required by ACR criteria."  (*Id*. at 15.)  With regard to her cardiovascular and mental

impairments, the Commissioner argues the ALJ accurately summarized the medical evidence and

properly accounted for these impairments in the RFC.  (*Id*. at 15-16.)

    The RFC determination sets out an individual's work-related abilities despite his or her

limitations.  *See* 20 C.F.R. § 416.945(a).  A claimant's RFC is not a medical opinion, but an

administrative determination reserved to the Commissioner.  *See* 20 C.F.R.§ 416.927(d)(2).[5]  An

ALJ "will not give any special significance to the source of an opinion on issues reserved to the

Commissioner."  *See* 20 C.F.R.§ 416.927(d)(3).  As such, the ALJ bears the responsibility for

assessing a claimant's RFC based on all of the relevant evidence, 20 C.F.R. § 416.946(C), and

must consider all of a claimant's medically determinable impairments, both individually and in

combination.  *See* SSR 96–8p, 1996 WL 374184 (SSA July 2, 1996).

    "In rendering his RFC decision, the ALJ must give some indication of the evidence

upon which he is relying, and he may not ignore evidence that does not support his decision,

especially when that evidence, if accepted, would change his analysis."  *Fleischer*, 774

F.Supp.2d at 880 (citing *Bryan v. Comm'r of Soc. Sec*., 383 Fed. Appx. 140, 148 (3d Cir. 2010)

("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual

functional capacity determination,' and must also 'mention or refute [...] contradictory, objective

---

[5] This regulation has been superseded for claims filed on or after March 27, 2017.  As
Wood's applications were filed in August 2014, this Court applies the rules and
regulations in effect at that time.

medical evidence' presented to him.")).  *See also* SSR 96–8p at *7, 1996 WL 374184 (SSA July 2, 1996) ("The RFC assessment must always consider and address medical source opinions.  If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.")).  While the RFC is for the ALJ to determine, however, it is well established that the claimant bears the burden of establishing the impairments that determine his RFC.  *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999).

The Court will address the parties' arguments regarding Wood's fibromyalgia, coronary artery disease, and mental health impairments separately, below.

### *Fibromyalgia*

The ALJ determined Wood's fibromyalgia did not constitute a medically determinable impairment at step two of the sequential evaluation process.  (Tr. 17.)  Specifically, the ALJ found as follows:

> The claimant has additionally alleged that she suffers from fibromyalgia.  Social Security Ruling 12-2p provides guidance in evaluating disability claims of individuals with fibromyalgia.  Per that ruling, a physician's diagnosis is not, in and of itself, enough to establish fibromyalgia as a medically determinable impairment; additional evidence is required to show specific diagnostic criteria.  In the present case, there is no evidence that the claimant's physicians conducted tender point testing that showed that she had at least 11 of 18 tender points.  Likewise, the record does not show that the claimant's physicians conducted examinations or testing to rule out other disorders that could account for the claimant's symptoms: for example, diagnostic testing to determine the presence of an autoimmune disease.  Since these additional criteria have not been met, the undersigned finds fibromyalgia to be a non-medically determinable impairment.

(Tr. 17-18.)  There is no further mention or discussion of fibromyalgia at any point in the decision.

At step four, the ALJ discussed the medical evidence regarding Wood's severe impairments, which included diabetes, carpal tunnel syndrome, polyneuropathy, coronary artery

disease, migraines, depression, personality disorder, and history of post-traumatic stress disorder.[6]  (Tr. 17, 20-23.)  The ALJ acknowledged Wood's complaints of dizziness, numbness, weakness, headaches, fatigue, depression, panic attacks, and generalized anxiety.  (Tr. 20-26.)  The ALJ discussed the objective medical evidence regarding Wood's physical impairments, including the results of the CT and MRI scans of Wood's brain; her carotid ultrasounds, cardiac catheterizations, and echocardiogram; and the EMG of her upper and lower extremities.  (*Id.*)  While noting some abnormal physical examination findings, the ALJ emphasized that numerous treatment records showed no "abnormal physical findings."  (*Id.*)  Specifically, the ALJ noted consistent findings of normal range of motion, normal gait, normal musculoskeletal function, normal sensation, and "generally normal strength and reflexes."  (*Id.*)  The ALJ also emphasized the numerous references in the record to Wood's non-compliance with treatment recommendations, particularly with respect to her diabetes.  (Tr. 22.)

The ALJ assessed the following RFC for the time period January 27, 2011 through July 21, 2014:

> After careful consideration of the entire record, the undersigned finds that, as of January 27, 2011 but prior to July 21, 2014, the claimant had the residual functional capacity to perform light work[7] as defined in 20 CFR  404.1567(b) and  416.967(b)

---

[6] As discussed *supra*, the ALJ found that, for the time period January 27, 2011 through July 21, 2014, Wood suffered from the severe impairments of diabetes mellitus, carpal tunnel syndrome, polyneuropathy, coronary artery disease, and cardiomyopathy, a cerebral hemisphere cyst, carotid artery stenosis, migraines, and depression.  (Tr. 17.)  For the time period since July 21, 2014, the ALJ found Wood also suffered from the additional severe impairments of personality disorder and history of post-traumatic stress disorder.  (Tr. 23.)

[7] "Light work" is defined as follows: "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires

except she could occasionally push and pull with the bilateral lower extremities; could frequently operate foot controls bilaterally; could frequently use bilateral hand controls; could frequently handle, finger, and feel with the right upper extremity; could occasionally balance; could frequently crouch and crawl; could never climb ladders, ropes, or scaffolds; could never be exposed to unprotected heights, dangerous, moving mechanical parts, or operate a motor vehicle; and could understand, remember, and carry out only simple, routine tasks.

(Tr. 20.)  For the time period after July 21, 2014, the ALJ assessed a more restrictive RFC, as

follows:

> After careful consideration of the entire record, the undersigned finds that, since July 21, 2014, the claimant has had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she must be allowed to change position every 30 minutes for 1 to 2 minutes at a time so long as she stays within the immediate vicinity of her workstation; can occasionally push and pull with the bilateral lower extremities; can frequently operate foot controls bilaterally; can frequently use bilateral hand controls; can frequently handle, finger, and feel with the right upper extremity; can occasionally balance; can frequently crouch and crawl; can never climb ladders, ropes, or scaffolds; can never be exposed to unprotected heights, dangerous, moving mechanical parts, or operate a motor vehicle; can understand, remember, and carry out only simple, routine tasks, but not at a production rate pace (e.g. assembly line work); can make simple work-related decisions; requires a work environment where changes are well-explained and introduced slowly; can frequently interact with supervisors; can interact superficially with coworkers; and can never interact with the general public.

(Tr. 24.)

The Court finds the ALJ failed to properly analyze Wood's fibromyalgia.  Social

Security Ruling ("SSR") 12-2p describes fibromyalgia ("FM") as "a complex medical condition

characterized primarily by widespread pain in the joints, muscles, tendons, or nearby soft tissues

---

a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities." 20 CFR § 404.1567(b). Social Security Ruling 83–10 clarifies that "since frequent lifting or carrying requires being on one's feet up to two-thirds of a workday, the full range of light work requires standing or walking, off or on, for a total of approximately six hours of an 8–hour workday." SSR 83–10, 1983 WL 31251 (1983).

that has persisted for at least 3 months." SSR 12–2p, 2012 WL 3104869 at *2. SSR 12–2p explains fibromyalgia is a "common syndrome" and that a person's symptoms must be considered when the agency decides if the individual has a medically determinable impairment ("MDI") of fibromyalgia ("FM"). *Id*. Pursuant to the Ruling, "FM is an MDI when it is established by appropriate medical evidence," and the disease "can be the basis for a finding of disability." *Id*. Only a licensed physician can provide evidence of an MDI of FM, but the physician's diagnosis alone is insufficient. *Id*. Rather, the evidence must "document that the physician reviewed the person's medical history and conducted a physical exam." *Id*. The agency will "review the physician's treatment notes to see if they are consistent with the diagnosis of FM, determine whether the person's symptoms have improved, worsened, or remained stable over time, and establish the physician's assessment over time of the person's physical strength and functional abilities." *Id.*

The Agency will find that a person has a medically determinable impairment of fibromyalgia if a physician diagnosed fibromyalgia and provides the evidence described under § II.A or § II.B of the Ruling, and the physician's diagnosis is not inconsistent with the other evidence in the individual's case record. *Id.* Under § II.A, the agency "may find that a person has an MDI of FM if he or she has all three of the following":

   1.  A history of widespread pain-that is, pain in all quadrants of the body (the right and left sides of the body, both above and below the waist) and axial skeletal pain (the cervical spine, anterior chest, thoracic spine, or low back) that has persisted (or that persisted) for at least 3 months' and which "may fluctuate in intensity and may not always be present;"

   2.  "At least 11 positive tender points on physical examination" which must be

found in specified locations;[8] and

    3. Evidence that other physical and mental disorders that could cause the symptoms or signs were excluded, such as "imaging and other laboratory tests (for example, complete blood counts, erythrocyte sedimentation rate, anti-nuclear antibody, thyroid function, and rheumatoid factor)."

*Id.* at *2–3.  Alternatively, a person may be found to have a medically determinable impairment

of fibromyalgia under § II.B of SSR 12-2p if he has all three of the following criteria:

    1. A history of widespread pain as described under § II. A.;

    2. "Repeated manifestations of six or more FM symptoms, signs, or co-occurring conditions, especially manifestations of fatigue, cognitive or memory problems ("fibro fog"), waking unrefreshed, depression, anxiety disorder, or irritable bowel syndrome;" and

    3. Evidence that "other disorders that could cause these repeated manifestations of symptoms, signs, or co-occurring conditions were excluded.

*Id.* at 3.  Co-occurring conditions include "anxiety disorder, chronic fatigue syndrome, irritable

bladder syndrome, interstitial cystitis, temporomandibular joint disorder, gastroesophageal reflux

disorder, migraine, or restless leg syndrome."  *Id.* at fn. 10.

    Here, the ALJ determined "there is no evidence that the claimant's physicians

---

[8]  SSR 12–2p requires a finding of "[a]t least 11 positive tender points [which] must be found bilaterally (on the left and right sides of the body) and both above and below the waist" and which are located on each side of the body.  SSR 12–2p, 2012 WL 3104869 at *3.  The tender points are located at the following 18 sites: Occiput (base of the skull); Low cervical spine (back and side of the neck);  Trapezius muscle (shoulder); Supraspinatus muscle (near the shoulder blade);  Second rib (top of the rib cage near the sternum or breast bone); Lateral epicondyle (outer aspect of the elbow); Gluteal (top of the buttock); Greater trochanter (below the hip); and Inner aspect of the knee.  *Id.*  The Ruling provides that in performing the testing, "the physician should perform digital palpation with an approximate force of 9 pounds (approximately the amount of pressure needed to blanch the thumbnail of the examiner). The physician considers a tender point to be positive if the person experiences any pain when applying this amount of pressure to the site."  *Id.* at § II.A.2.b.

conducted tender point testing that showed that [Wood] had at least 11 of 18 tender points."  (Tr. 17-18.)  The ALJ also found "the record does not show that the claimant's physicians conducted examinations or testing to rule out other disorders that could account for the claimant's symptoms."  (*Id.*)  Both of these statements are incorrect.  As set forth *supra*, on April 11, 2011, Wood presented to neurologist Dr. Patel with complaints of "multiple pain areas in her body," as well as fatigue, headaches, dizziness, and numbness.  (Tr. 1082.)  Dr. Patel conducted a physical examination of Wood and found "multiple tender points . . . all over her body."  (Tr. 1084.)  He noted Wood's diagnosis "would be consistent with fibromyalgia," but ordered additional testing (including a complete EMG and extensive blood work) to rule out other conditions that might be causing her symptoms.  (Tr. 1085.)

Wood returned to Dr. Patel on October 21, 2011, after having completed the additional testing.  (Tr. 991-994.)  She again complained of pain "all over," stating "some days she can not even get out of bed."  (Tr. 991.)  On examination, Dr. Patel noted "multiple tender points amounting to more than 18."  (Tr. 994.)  He discussed the results of Wood's testing, noting that both the upper/lower extremity EMG testing and blood work (including sedimentation rate, creatine kinase, folate, and protein -C and protein-S antibodies) were essentially normal.  (Tr. 991, 994.)  After examining Wood again and reviewing the results of her testing, Dr. Patel concluded she suffered from fibromyalgia in association with small fiber neuropathy, and prescribed medication.  (Tr. 994.)  Subsequent treatment records consistently indicate a diagnosis of, and treatment for, fibromyalgia.  (Tr. 898, 489, 412, 1205.)

The ALJ does not acknowledge Dr. Patel's findings regarding Wood's fibromyalgia at any point in the decision nor does she otherwise adequately explain why Dr. Patel's fibromyalgia

40

diagnosis fails to satisfy the criteria set forth in § II.A of SSR 12-2p.  Moreover, as Wood correctly notes, the ALJ failed to consider whether the medical evidence demonstrated she satisfied the criteria for fibromyalgia under § II.B of SSR 12-2p.  Under that section, a claimant's fibromyalgia is considered an MDI if she has (1) a history of widespread pain; (2) "repeated manifestations of six or more [fibromyalgia] symptoms, signs, or co-occurring conditions, especially manifestations of fatigue, cognitive or memory problems ('fibro fog'), waking unrefreshed, depression, anxiety disorder, or irritable bowel syndrome;" and (3) evidence that other disorders that could cause these repeated manifestations of symptoms, signs, or co-occurring conditions were excluded.  The ALJ's failure to consider whether Wood satisfied the criteria set forth in § II.B is problematic because there is evidence in the treatment records that could support such a finding, including evidence documenting Wood's long-standing complaints of all-over body pain, fatigue, depression, anxiety, and memory loss.  (Tr. 1009-1010, 1082, 991, 757, 895, 544-545, 522, 488, 411, 775-776, 712.)  Additionally, and contrary to the ALJ's finding, Dr. Patel expressly considered whether other disorders could be causing Wood's symptoms and ordered testing to exclude them.  (Tr. 1085, 991,994.)

The Commissioner suggests remand is not required because the ALJ found Wood suffered from polyneuropathy, which "generally overlapped with Plaintiff's fibromyalgia symptoms." (Doc. No. 12 at 15.)  The Court rejects this argument.  Clearly, the ALJ considered fibromyalgia and polyneuropathy to be distinct conditions, as she addressed them separately and determined Wood's fibromyalgia was not a MDI, but her polyneuropathy was a severe impairment.  Moreover, the Commissioner offers no support for her conclusory statement that fibromyalgia and polyneuropathy symptoms "generally overlap" or that consideration of one of

these conditions necessarily subsumes the other.

The Commissioner also argues remand is not required because the ALJ assessed significant physical RFC restrictions and, therefore, "fully accounted for Plaintiff's physical limitations, regardless of whether they are attributed to fibromyalgia, polyneuropathy, or a combination of both." (Doc. No. 12 at 15.)  This argument is without merit.  The ALJ did not find Wood's fibromyalgia to be a non-severe impairment and then consider it (along with all her other severe and non-severe impairments) in assessing the RFC.  Rather, she determined Wood's fibromyalgia was not a medically determinable impairment under SSR 12-2p and, thus, did not consider any limitations resulting therefrom in the RFC.  *See Howell v. Comm'r of Soc. Sec.*, 2018 WL 565682 at * 12 (N.D. Ohio Jan. 9, 2018) (noting ALJ failed to recognize fibromyalgia as a MDI and, therefore, necessarily failed to consider any limitations resulting therefrom at step four).  Indeed, the ALJ did not even mention (much less analyze) Wood's fibromyalgia at step four or otherwise give any indication that she considered this condition in fashioning the physical limitations set forth in the RFC, either for the period January 27, 2011 through July 21, 2014 or for the period after July 21, 2014.

Moreover, while the ALJ did consider Wood's other physical impairments in assessing the RFC, this does not remedy the ALJ's failure to properly address her fibromyalgia in light of the unique characteristics of that condition.  As noted above, in determining Wood could perform a reduced range of light work at step four, the ALJ emphasized Wood's treatment records showing no "abnormal physical findings." (Tr. 20-26.)  Specifically, the ALJ cited consistent findings of normal range of motion, normal gait, normal musculoskeletal function, normal sensation, and "generally normal strength and reflexes," as a basis for her conclusion that Wood

was not disabled during the relevant time period.  (*Id.*)  It is clear, however, that the lack of

"objective" medical evidence is not unusual, but rather the norm in fibromyalgia cases.  *See*

*Rogers v. Comm'r of Soc. Sec*, 486 F.3d 234, 244 (6th Cir. 2007) (noting that CT scans, x-rays,

and minor abnormalities "are not highly relevant in diagnosing [fibromyalgia] or its severity");

*Preston v. Sec'y of Health & Human Svcs*., 854 F.2d 815, 817-818 (6th Cir. 1988) (stating that

"[t]here are no objective tests which can conclusively confirm" fibromyalgia); *Keating v.*

*Comm'r of Soc. Sec*., 2014 WL 1238611 at * 6 (N.D. Ohio March 25, 2014) ("This circuit has

recognized that symptoms of fibromyalgia are often not supportable by objective medical

evidence"); *Schlote v. Astrue*, 2012 WL 1965765 at * 6 (N.D. Ohio May 31, 2012).  Similarly,

the fact that physical examinations of Wood's extremities and neurological systems often yielded

normal findings is not necessarily inconsistent with fibromyalgia.  Indeed, the Sixth Circuit has

repeatedly and consistently recognized that fibromyalgia patients typically "manifest normal

muscle strength and neurological reactions and have a full range of motion."  *Kalmbach v.*

*Comm'r of Soc. Sec*., 409 Fed. Appx. 852, 861-862 (6th Cir. 2011) (citing *Preston*, 854 F.2d at

820).  *See also Starcher v. Comm'r of Soc. Sec.,* 2016 WL 5929048 at * 6 (S.D. Ohio Oct. 12,

2016) ("As SSR 12-2p indicates, and as the case law has established, a fibromyalgia sufferer can

present to a physician without any significant objective signs or symptoms*."*);*Minor v. Comm'r*

*of Soc. Sec*., 513 Fed. Appx. 417, 434 (6th Cir. 2013) (noting fibromyalgia claimants

"demonstrate normal muscle strength and neurological reactions and can have a full range of

motion"); *Keating*, 2014 WL 1238611 at *6.

        As this Court has noted on previous occasions, "[it] is incumbent upon the ALJ to apply

the correct standard under existing Sixth Circuit precedent" when evaluating fibromyalgia

claims. *Schlote*, 2012 WL 1965765 at * 6.  Here, the ALJ failed to properly analyze Wood's

fibromyalgia at step two, which, in turn, improperly influenced the ALJ's analysis of Wood's

limitations at step four.  As other courts have explained, "[t]he error is therefore not harmless, or,

at least, the Commissioner has not carried the burden of showing that it was, and a remand is

required in order for the ALJ properly to evaluate the case in light of the diagnosis of

fibromyalgia."  *Starcher*, 2016 WL 5929048 at * 6.  *See also Howell*, 2018 WL 565682 at * 12.

Accordingly, it is recommended this matter be remanded for further evaluation of

Wood's fibromyalgia as a medically determinable impairment, and to re-evaluate the physical

limitations in the RFC.

### *Coronary Artery Disease*

Wood next argues the ALJ "failed to fully consider and evaluate the severity of [her]

cardiac and cardiovascular impairments."  (Doc. No. 11 at 18.)  Specifically, she maintains the

ALJ failed to consider Dr. Christofferson's conclusion that Wood suffers from Class III Stable

Angina.  (*Id*.)  Citing the Canadian Cardiovascular Society Website, Wood argues Class III

Stable Angina is defined as follows: "Marked Limitation of ordinary physical activity.  Walking

1 or 2 blocks on the level and climbing 1 flight of stairs in normal condition and at normal pace."

(*Id*.) Wood maintains the ALJ failed to take this into account when determining the physical

limitations in the RFC.

The Court finds the ALJ properly considered the medical evidence regarding Wood's

cardiovascular impairments.  At step two, the ALJ found Wood suffered from the severe

impairments of coronary artery disease, cardiomyopathy, a cerebral hemisphere cyst, and carotid

artery stenosis.  (Tr. 17.)  After determining Wood did not meet or equal the requirements of

44

Listings 4.02 (Chronic heart failure) and 4.04 (ischemic heart disease) at step three, the ALJ went on at step four to consider the medical evidence regarding Wood's cardiovascular impairments. The ALJ recounted objective test results regarding these impairments, including Wood's February 2011 carotid ultrasound, June 2012 echocardiogram and cardiac catheterization, CT and MRI brain scans, June 2015 echocardiogram, and August 2015 cardiac catheterization.  (Tr. 20-24.)  The ALJ also discussed Wood's ER and hospital visits, as well as her treatment for this condition with cardiologists Dr. Ibrahim and Dr. Christofferson, neurologist Dr. Patel, and primary care physicians Drs. Iqbal and Goldsmith.  While the ALJ acknowledged Wood's struggles with chest pain and shortness of breath, she also noted normal examination findings relating to her cardiac condition, including normal heart rate and rhythm, normal breathing sounds, normal neurological function, normal reflexes, and normal strength.  (*Id*.)  Indeed, the ALJ noted Wood presented with largely normal examination findings "despite her newest catheterization findings showing stenosis."  (Tr. 25.)

In light of the above, the Court finds the ALJ properly considered the medical evidence regarding Wood's cardiovascular impairments.  The Court further concludes the ALJ's findings are supported by substantial evidence.  While Wood frequently complained of chest pain and shortness of breath, cardiovascular physical examination findings were largely normal, including normal heart rate and rhythm, normal breathing sounds, no edema, and normal strength.  (Tr. 550, 537, 503, 523-524, 489, 411, 469, 715-716, 779, 1156.)  Moreover, neither of Wood's cardiologists (Drs. Ibrahim or Christofferson) placed restrictions on her physical activities or offered an opinion that she suffered physical functional limitations as a result of her cardiovascular impairments.  Although the ALJ did not expressly discuss Dr. Christofferson's

45

finding that Wood had Class III Stable Angina,[9] an ALJ is not required to discuss each and every piece of evidence in the record.  *See, e.g., Thacker v. Comm'r of Soc. Sec*., 99 Fed. Appx 661, 665 (6th Cir. 2004); *Moscorelli v. Colvin*, 2016 WL 4486851 at * 3 (N.D. Ohio Aug. 26, 2016). Here, the ALJ thoroughly and accurately considered the medical evidence regarding Wood's cardiovascular impairments.  Wood's argument to the contrary is without merit.

### *Mental Impairments*

Wood next argues the ALJ failed to fully consider the evidence regarding her mental impairments.  (Doc. No. 11 at 19.)  In particular, Wood faults the ALJ for failing to properly address her treatment records from Firelands Counseling.  (*Id*.)  She maintains "the few times the ALJ referred to the Firelands records was to show that [Wood] had appropriate affect and was cooperative . . . [y]et a review of the complete psychiatric treatment records evidenced a much different woman."  (*Id*.)  Wood argues the ALJ failed to recognize that her symptoms varied over time and, instead, "engaged in a selective analysis of the evidence to support her conclusion." (*Id.*)

The Court finds the ALJ thoroughly and properly considered the medical evidence regarding Wood's mental impairments.  The ALJ first determined that, for the period January 27, 2011 through July 21, 2014, Wood suffered from the severe mental impairment of depression. (Tr. 17.) For the period after July 21, 2014, the ALJ found Wood suffered from the additional severe mental health impairments of personality disorder and history of post-traumatic stress

---

[9] It is not entirely clear to the Court what a diagnosis of Class II Stable Angina means. Citing a Canadian medical website, Wood argues Dr. Christofferson's diagnosis indicates she has a marked limitation in her ability to walk and climb stairs.  (Doc. No. 11 at 18.) The Court notes, however, that Dr. Christofferson did not assess any particular physical functional limitations relating to this condition.

disorder. (Tr. 23.)  At step four, the ALJ evaluated the medical evidence regarding Wood's

mental impairments as follows:

>Concerning her mental health, on July 21, 2014, the claimant presented to the emergency room  in tears, and was psychiatrically admitted after reporting severe depression and suicidal ideation. (Exhibit 4F, p. 7-12; Exhibit 5F, p. 17-18).  In an evaluation the following day, a hospital psychiatrist observed that she had decreased psychomotor activity, decreased speech, a depressed mood and restricted affect, and impaired judgment and insight. (Exhibit 5F, p. 164-65).  The claimant discharged to partial hospitalization program care on July 23, 2014, and admitted to Dr. Goldsmith on July 31, 2014 that she no longer had suicidal thoughts, though the doctor did continue to observe a depressed mood. (Exhibit 4F, p. 4, 6; Exhibit 5F, p. 14-15).  She [was] discharged from hospital care altogether the following day. (Exhibit 4F, p. 24).

>The claimant began regular counseling at Firelands Counseling & Recovery Services on August 4, 2014; at her initial assessment, she stated that she had panic attacks in public places and lacked the motivation on most days to leave her bed. (Exhibit 2F, p. 4).  At a follow-up with Dr. Goldsmith a month later, the  claimant reported that she had been attending weekly counseling sessions and "feels she is not quite as angry."  The doctor again noted a depressed mood. (Exhibit 5F, p. 9-10).  As of December 2014, the claimant regularly reported feeling anxious at home, though her counselor observed that she had an appropriate  affect and behavior during their sessions. (Exhibit 9F, p. 3-4).  She first met with Dr. Hegde on December 16, 2014; she admitted that she was "doing fair on her medication," but reported some anxiety related to the holiday season.  Dr. Hegde observed a "somewhat" sad mood, but an intact memory, and did not note  any unusual focus or difficulty establishing a rapport.  He diagnosed major depressive disorder and an unspecified personality disorder. (Exhibit 9F, p. 5).

>At her January 27, 2015 neurology consultation, the claimant complained of memory loss; however, the  examiner explicitly stated that there was "no suggestion of cognitive or memory disturbance evident." (Exhibit 7F, p. 5).  The claimant continued to meet with her counselor,  Dr. Hegde, and with Dr. Goldsmith, and routinely presented with a normal mood and affect, appropriate behavior, and an intact memory.  (Exhibit 9F, p. 7-8; Exhibit 11F, p. 12; Exhibit 13F, p. 7; Exhibit 14F, p. 1-5, 7-9, 11-12, 14-15, 18, 21-22, 24-26, 28-30.)

>    *  *  *

>Although her depression and personality disorder have certainly required a greater degree of care since July 21, 2014 such that she actually needed to be briefly hospitalized, the claimant actually appears to have responded well to her more

> advanced psychiatric care.  She herself admitted to Dr. Hegde that her medications
> were effective in controlling her moods, and her reports of severe anxiety in public
> places are inconsistent with the multiple statements by both Dr. Hegde and her
> counselors concerning her normal mood and affect and appropriate behavior.

(Tr. 25-26.)  For the period after July 21, 2014, the ALJ accorded "great weight" to the opinions

of state agency psychologists Drs. Kravitz and Tangeman, explaining "[t]he symptoms described

during her July 2014 hospitalization, and the fact that the claimant now requires regular

psychiatric care and counseling, along with a more advanced medication regimen, warrants

further mental limitations, and the doctors' proposed restrictions are therefore adopted directly

into the residual functional capacity as a limitation to simple work not performed at a fast pace,

with only simple decision making, slow and carefully regulated changes, and greatly reduced

interpersonal requirements."  (Tr. 26.)  The ALJ accorded little weight to Dr. Hegde's opinion

that Wood was not able to work due to her mental impairments, finding that "[a]part from the

fact that the ability to work is reserved for the Commissioner, as stated above, the doctor's

opinion is inconsistent with his own examination reports, and his observations of the claimant's

normal mood and affect and normal memory, as well as the claimant's recorded admission that

her medications were effective."  (*Id*.)

    The Court finds the ALJ properly considered the medical evidence regarding Wood's

mental impairments.  The ALJ acknowledged Wood's complaints of depression, lack of

motivation, anxiety, and panic attacks in public places.  (Tr. 25.)  The decision discussed Wood's

July 2014 psychiatric hospitalization and mental health treatment with Dr. Hegde and Firelands

Counseling.  (*Id*.)  While the ALJ did not discuss the specific content of each and every

counseling treatment note, the ALJ recognized Wood attended weekly counseling sessions and

acknowledged her continuing struggles with anxiety, depression, and fear of leaving home.  (*Id*.)

The ALJ found, however, that Wood was improving with mental health treatment and medication, noting that mental status examinations generally found appropriate affect and behavior.  (*Id.*)  In recognition of Wood's mental health symptoms, the ALJ included numerous mental restrictions in the RFC for the period after July 21, 2014, i.e., that Wood "can understand, remember, and carry out only simple, routine tasks, but not at a production rate pace (e.g. assembly line work); can make simple work-related  decisions; requires a work environment where changes are well-explained and introduced slowly; can frequently interact with supervisors; can interact superficially with coworkers;  and can never interact with the general public."  (Tr. 24.)  The ALJ also specifically noted that "by superficially, the undersigned means the ability to greet people, refer to coworkers to other co-workers regarding co-workers' demands or requests, answer questions about time of day, and give directions to the bathroom. Superficial interaction would not involve claimant dealing directly with demands or problems of the coworker."  (*Id.*)

The ALJ's findings are supported by substantial evidence.  After Wood's psychiatric hospitalization in July 2014, she presented for regular mental health treatment at Firelands Counseling with Counselor Allton-Cameron and Dr. Hegde.  In December 2014, Wood reported that she was "doing fair" on her medications and that they "seem to be working for her."  (Tr. 724-725, 726.)  On mental status examination, Dr. Hegde found Wood was pleasant and cooperative with good eye contact, a "somewhat sad" mood, appropriate affect, normal speech, linear thought process, intact memory, and fair judgment and insight.  (Tr. 724-725.)  While Wood was anxious and had a "rough" time during the beginning of 2015, her mental health treatment providers generally noted normal/appropriate affect, appropriate behavior, normal

49

speech, linear thought process, normal thought content, intact memory, and fair judgment and insight.  (Tr. 1175, 1176, 1179-1180.)  Dr. Hegde adjusted Wood's medications several times during 2015.  (Tr. 1179-1180, 1186-1187.)  In August 2015, Wood reported Seroquel was helping.  (Tr. 1189.)  By October 2015, Wood indicated she was "doing better than before" and was "able to manage herself."  (Tr. 1196.)  On examination, Dr. Hegde noted better mood, bright affect, normal speech, linear thought process, normal thought content, intact memory, and fair judgment/insight.  (*Id*.)  Mental status examination findings in November 2015 were largely normal.  (Tr. 1200.)  In January 2016, Wood reported she was able to go to her son's basketball game and out to dinner with her mother.  (Tr. 1203.)

Based on the above, the Court finds the ALJ's determination that Wood was improving with treatment and medication is supported by substantial evidence.  While the Court acknowledges there is evidence in the record that might support Wood's argument, the ALJ's findings herein are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion.  *See Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001); *Her*, 203 F.3d at 389-90.  Rather, as noted above, the substantial evidence standard presupposes "there is a zone of choice within which the [ALJ] may proceed without interference from the courts."  *Felisky*, 35 F.3d at 1035.  "This 'zone of choice' includes resolving conflicts in the evidence and deciding questions of credibility."  *Postell v. Comm'r of Soc. Sec.*, 2018 WL 1477128 at *10 (E.D. Mich. March 1, 2018), *report and recommendation adopted*, 2018 WL 1471445 (E.D. Mich. March 26, 2018).  Here, the ALJ's step four findings regarding Wood's mental impairments are within that "zone of choice" and thus supported by substantial evidence.  Wood's argument to the contrary is without merit.

*Treating Physician Dr. Goldsmith*

In her final assignment of error, Wood argues the ALJ failed to properly evaluate the opinion of treating physician, Dr. Goldsmith.  (Doc. No. 11 at 20.)  She maintains the ALJ's conclusions regarding Dr. Goldsmith's opinion "lacked the specificity required by law, were vague and incorrect, and not good reasons."  (*Id*.)  In particular, Wood maintains the ALJ accorded Dr. Goldsmith's opinion "little weight" because treatment records documented mainly normal physical examination findings and Dr. Goldsmith's opinion was inconsistent with the record as a whole.  (*Id*. at 22.)  Wood asserts, however, that "the error the ALJ committed in her evaluation of fibromyalgia in the first instance, led to a faulty analysis of Dr. Goldsmith's opinion."  (*Id*.)  She notes that those who suffer from fibromyalgia often manifest normal examination findings and, therefore, the ALJ's failure to recognize her fibromyalgia caused her to improperly analyze Dr. Goldsmith's opinion. (*Id*.)

The Court agrees.  In her February 1, 2016 opinion, Dr. Goldsmith specifically identified fibromyalgia as one of Wood's physical impairments.[10]  (Tr. 1205-1206.)  Dr. Goldsmith concluded that, as a result of her impairments (including fibromyalgia), Wood could lift 10 to 20 pounds occasionally and 5 pounds frequently; stand for 30 minutes at one time and for a total of 2 hours in a workday; and sit for 60 minutes at one time and for a total of 4 hours in a workday.  (*Id*.)  She further found Wood could constantly balance; frequently engage in fine manipulation bilaterally; occasionally bend, stoop, and work around dangerous machinery; and never engage in gross manipulation bilaterally or raise her left or right arm over her shoulders.

---

[10] This is consistent with Dr. Goldsmith's treatment records, which listed fibromyalgia as one of Wood's diagnoses.  (Tr. 489, 524.)

51

(*Id*.)  Lastly, Dr. Goldsmith noted as follows: "[Patient] needs to change positions frequently. Has 'good and bad days.'  She would likely miss > 5 days per month due to her medical issues." (*Id*.)

As noted *supra*, the ALJ found Wood's fibromyalgia did not constitute a medically determinable impairment and, therefore, the ALJ did not consider this condition at step four, either in evaluating Dr. Goldsmith's opinion or in fashioning the RFC.  For reasons similar to those discussed above in connection with Wood's first assignment of error, the Court finds the ALJ's failure to properly evaluate Wood's fibromyalgia as a medically determinable impairment also improperly influenced her evaluation of Dr. Goldsmith's opinion.  In according "little weight" to Dr. Goldsmith's opinion, the ALJ found that the "extraordinary limitations" she assessed were inconsistent with the fact that Wood "consistently present[ed]" for examinations with normal examination findings, including normal gait, normal reflexes, and a normal "ability to move about" (i.e., a normal range of motion).  (Tr. 22, 26.)  As noted at length *supra*, however, the fact that physical examinations often yielded normal findings is not necessarily inconsistent with fibromyalgia.  *See e.g.*, *Kalmbach*, 409 Fed. Appx. at 861-862 (recognizing that fibromyalgia patients typically "manifest normal muscle strength and neurological reactions and have a full range of motion.")*; Minor*, 513 Fed. Appx. 417, 434 (6th Cir. 2013) (noting fibromyalgia claimants "demonstrate normal muscle strength and neurological reactions and can have a full range of motion")*; Starcher*, 2016 WL 5929048 at * 6 ("As SSR 12-2p indicates, and as the case law has established, a fibromyalgia sufferer can present to a physician without any significant objective signs or symptoms"*)*.  Because Dr. Goldsmith's February 2016 opinion was based (at least in part) on Wood's complaints of severe pain stemming from fibromyalgia, the

52

Court finds the ALJ's failure to properly evaluate Wood's fibromyalgia improperly influenced the ALJ's evaluation of Dr. Goldsmith's opinion and necessitates a remand.

Accordingly, and as this matter is being remanded for the ALJ to re-evaluate Wood's fibromyalgia and the physical limitations in the RFC, it is further recommended that the ALJ re-evaluate Dr. Goldsmith's February 2016 opinion on remand.

## VII.   CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be VACATED and the case REMANDED for further proceedings consistent with this decision.

*s/Jonathan D. Greenberg*
Jonathan D. Greenberg
United States Magistrate Judge

Date: November 9, 2018

### OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**